Winding River Ranch, Inc. v. Commissioner.
Winding River Ranch, Inc. v. Commissioner
Docket No. 5123-64.
United States Tax Court
T.C. Memo 1966-260; 1966 Tax Ct. Memo LEXIS 23; 25 T.C.M. (CCH) 1335; T.C.M. (RIA) 66260; November 30, 1966
*23 Petitioner acquired 710 acres from its sole stockholder in 1956. A part of this, some 115 acres, had been laid out as a subdivision and some blocks had previously been sold. Petitioner contracted with a builder to transfer to the builder a parcel for home construction and to transfer successive parcels as the builder could pay for them with a certain acreage to be taken each year. In 1961 petitioner transferred to this builder a parcel for cash and notes. In the same year petitioner took a single 30-day note in place of several existing notes and discounted the note at a bank. Held: (1) Petitioner "disposed" of the note within the meaning of section 453(d) and is not entitled to return the gain on the installment method; (2) Petitioner did not hold the property primarily for sale to customers in the ordinary course of its trade or business. Edwin Fradkin, for the petitioner. Julius M. Jacobs, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined a deficiency in income tax for the calendar year 1961 in the amount of $26,764.55. The issues remaining for decision are whether the sale of land during 1961 constituted the sale of a capital asset and whether installment obligations received upon the sale were sold or otherwise disposed of in 1961. Some facts are stipulated. Findings of Fact The stipulations of fact and exhibits attached thereto are incorporated herein by this reference. Winding River Ranch, Inc., hereinafter referred to as Winding, is a New Jersey corporation organized November 28, 1949. The certificate of incorporation states the objects and powers of the corporation as follows: 3. The objects for which this corporation is formed are to purchase, hold, own, take over, maintain, develop, sell, convey, lease, mortgage, *25 exchange, improve and to deal in real estate and real property or any interest and rights therein, without limit as to amount; to purchase, hold, own, take over, sell, hire, lease, mortgage, pledge, chattels and chattels real without limit as to amount, and to construct houses and buildings. To generally improve the property of the company; to maintain, construct, operate business or businesses, including hotel, restaurant, food, liquor and refreshments. The corporation shall also have power to conduct its business in all its branches, and unlimitedly to hold, purchase, mortgage and convey real and personal property in any state, territory or colony of the United States and in any foreign country or place. The incorporators of Winding were Philip Maimone, Ruth Maimone, August G. Hoffmann, and Elmer A. Hoffmann. The principal office of Winding was in Toms River, Ocean County, New Jersey. Winding filed its Federal income tax return for the calendar year 1961 with the district director of internal revenue at Camden, New Jersey. Philip Maimone has been for many years a dealer in automobiles. Prior to 1945 he assembled some 2,150 acres of land in the vicinity of Toms River. He made *26 one sale of 1,200 acres of this in 1949 and sold other parts in the following years until August 1956, when about 710 acres remained. In 1949 Winding operated a riding ranch on Maimone's property, including a food and liquor business, stables, and some miles of riding trails. After about a year Maimone bought out the interests of the Hoffmanns and since then the Maimones have been sole owners of the stock of Winding. On or about August 13, 1956, Maimone and his wife transferred the 710 acres of land to Winding for $47,000. The land was west of the Garden State Parkway and north of State Highway No. 37. The Toms River flowed through the property. In March 1957 the property, or a part of it, was advertised for sale in the Wall Street Journal as follows: FOR SALE All or parcels of a Million Dollar project, now under development, in and on Toms River, N.J., 1000feet from N. & S. Garden State Parkway Exits. Over 600 acres, 5 miles waterfront, 2000feet State Highway frontage, on Route 37 & New Trenton Road - very close to Route 9 - 10 miles of road frontage within tract (5 miles improved County Roads, 5 miles Township roads, finished and ready for black top.) Insured title. *27 Call Philip Maimone, Toms River 8-1201, for details of unlimited possibilities. Brokers protected. Similar advertisements appeared in other papers. In May 1959 the property, or part of it, was advertised in the Wall Street Journal as follows: WINDING RIVER located in Toms River, Ocean County, fastest growing County in New Jersey. One large project which can be divided into many units: Unit 1
An exclusive Cocktail Lounge,
cedar log and old brick cabin,
equipped to accommodate 200 food
and drinking guests - on the beauti-
ful stream of Toms River. Liquor
License - ready to operate within
72 hours.
Unit 2
With the above and more water-
front property, for high type
Motels.
Unit 3
Or - the over-all with swimming
pool, for an exclusive Cabana Club
Membership, accommodations which
can be sold out before project is
started.
These and several other Big Money making projects, owner will discuss details with interested parties. Over 400 acres and 3 miles waterfront available in and on Toms River, N.J. Only 45 to 90 minutes from Trenton, New York, Atlantic City and Philadelphia, and midway to all N.J. Race Tracks. Call: *28 Phil Maimone, DI 9-1201, or write Box 367, Toms River, N.J. Brokers protected. The property was advertised in 1957 in the New York Herald Tribune, Wall Street Journal, Newark News, and Philadelphia Inquirer. In 1959 and 1960 it was advertised in the Wall Street Journal. A part of the 710-acre tract conveyed to Winding in 1956, consisting of approximately 115 acres on the west side of the tract, had been surveyed and laid out in blocks and lots as a subdivision at some date not shown by the record but apparently in or prior to 1951. This area is herein referred to as Oak Ridge. The records of John A. Ernst, Jr., professional engineer and surveyor, disclose that he rendered services for Maimone in staking some of the area and making descriptions of certain lots in 1954 and in preparing a revision of a map in early 1956. He also performed similar services and prepared a new map of Oak Ridge for sales purposes later in 1956. A surveyor's map of Oak Ridge dated October 1956, prepared by Ernst, shows 423 building lots. Maimone had sold certain blocks of Oak Ridge, Blocks 1 to 8, inclusive, prior to August 1956. Louis C. Bock was a builder. He was interested in acquiring the Oak *29 Ridge property for building homes but could not afford to buy the entire tract at once. Maimone agreed orally with Bock to have Winding release or transfer land as Bock could use it. Under date of November 4, 1957, Winding and Louis C. Bock & Sons, a partnership, signed an agreement as follows: Agreement between Winding River Ranch, Inc., Philip Maimone, President, Toms River, N.J., and Louis C. Bock & Sons, partnership, of Waretown, N.J., for the purchase of three parcels of land in Oak Ridge, identified as follows: Block 10, which includes 4 lots surrounded by Oak Ridge Parkway, Morningside Avenue, Shady Nook Drive and Sun Valley Road; and Block 10A, consisting of 23 lots, surrounded by Sun Valley Road, Morningside Avenue, Winding River Drive and Shady Nook Drive; and 4 lots, # 29, 30, 31 and 32, facing Winding River Drive; to be purchased for $700.00 each, terms as follows: Total price $21,700.00. $4700.00 cash on signing agreement on or before November 30, 1957. $17,000.00 balance on a 30 day note endorsed by Louis C. Bock & Sons, a partnership - Louis C. Bock and Marcy C. Bock, his wife, personally; to be reduced at the rate of $300.00 per month, plus payments in full for *30 any number of lots used for any number of houses they wish to build, when they are completed and ready to sell. It is further understood that the purchase of this property, total 31 lots, will be used as an option, to expire April 1, 1958, on the balance of the property, approximately 20 blocks as described in Oak Ridge map, made up by John A. Ernst, Jr., October 1956. Pursuant to the contract of November 4, 1957, Louis C. Bock & Sons purchased the lots therein described for Bock-Builders, Inc., a New Jersey corporation. Winding delivered to Bock-Builders its deed for this property dated March 21, 1958. A new map of Oak Ridge prepared by Ernst dated January 1958 was duly filed in the Ocean County Clerk's Office, and the description in the deed referred to this map. Winding conveyed to Bock-Builders by deeds dated July 23, 1958, October 3, 1958, and January 19, 1959, certain additional blocks and lots in Oak Ridge. Ernst prepared for Bock-Builders a new map of Oak Ridge dated February 1959 entitled "Preliminary Plan Oak Ridge." This showed larger lots than those in the 1956 map. Under date of March 2, 1959, Winding and Bock-Builders agreed to the purchase and sale of four parts *31 of the tract designated therein as sections 4, 4A, 5, and 5A, as identified in lots and blocks upon the map of February 1959. The contract provided for payment as follows: 1. At the time of the signing of this agreement of sale, the Purchaser shall pay in cash and deliver to the Seller the sum of $3,500.00, this executed agreement being the receipt therefor, and the Purchaser shall at the same time make and deliver to the Seller two promissory notes, payable at The First National Bank of Toms River, N.J., as follows: (a) A note in the amount of $2,500.00, payable within three months from its date. (b) A note in the amount of $2,500.00, payable within six months from its date. The aforesaid two notes shall not be subject to renewal but shall be paid in full, without interest, on the due dates thereof. 2. In addition to the sums of money represented by the aforesaid cash payment and notes, the Purchaser shall pay to the Seller for each acre of the above described land to be conveyed the sum of $4,650.00. 3. The sum of $8,500.00, represented by the aforesaid cash payment and promissory notes, shall be credited by the Seller to the Purchaser as payment on account of the last *32 two acres, more or less, remaining of the entire acreage to be conveyed under the terms and conditions of this contract, which sum of $8,500.00 shall be subject to such adjustments, if any be necessary, based on the aforesaid price of $4,650.00 per acre. * * *
5. The Purchaser shall have the burden and expense of preparing a map or maps for the development and improvement of said acreage, of obtaining the approval of the Planning Board of Dover Township and such other approval as is necessary for such development and improvement of said acreage, and of filing such map or maps, as is required, in the County Clerk's Office at Toms River, New Jersey. 6. The Seller shall not be bound to convey any of said acreage until the same shall have been mapped and the map or maps filed in the Ocean County Clerk's Office after approval by the Dover Township Planning Board. * * *
8. It is further understood and agreed by and between the parties hereto that this contract shall remain in full force and effect so long as the Purchaser shall purchase and pay for a minimum of SIXTEEN (16) acres during each TWELVE-MONTH period from the date hereof, pursuant to the order of purchase hereinafter *33 set forth in Paragraph 9. * * * 9. It is further expressly understood and agreed by and between the parties hereto that the Purchaser shall purchase Section 4, hereinabove described, within the first TWELVE-MONTH period from the date hereof; Section 4A, hereinabove described, within the second TWELVE-MONTH period from the date hereof; Section 5, hereinabove described, within the third TWELVE-MONTH period from the date hereof; and Section 5A, hereinabove described, within the fourth TWELVE-MONTH period from the date hereof. Under a deed dated December 2, 1959, Winding conveyed to Bock-Builders lots 1 and 2 of Block 9 of Oak Ridge. On March 2, 1960, Winding and Bock-Builders agreed to an addendum or modification of the agreement of March 2, 1959. It was agreed that section 4 contains 14.7 acres and was the total acreage required to be purchased in the first 12-month period. Payment was agreed upon as follows: (a) The parties hereto agree that payment is to be made for the aforesaid 14.7 acres (Section 4) on or before March 2, 1960, in the following manner: The Purchaser is to pay the total price for said 14.7 acres, of $68,355.00, credit to be given for the sum of $4,650.00 heretofore *34 paid and the receipt thereof acknowledged, leaving a balance due of $63,705.00 which is to be paid on or before March 2, 1960 as follows: $13,355.05 in cash which figure represents principal in the amount of $10,705.00 and interest in the amount of $2,650.05 at 6%, payable in advance, in connection with the discounting of nine separate notes, each in the amount of $5,888.89, payable over a period of eighteen months, this being a series of notes, one note maturing each and every sixty days during said eighteen month period. The nine separate promissory notes aforesaid, in the aggregate, amount to $53,000.00, which represents the balance of the purchase price and its manner of payment in connection with the sale of Section 4. The aforesaid notes are to be executed in the name of the Purchaser herein, and drawn by it, and are to be endorsed individually by Louis Bock, Sr. and Marcy Bock, his wife. Payment for the remaining sections, 4A, 5 and 5A, described in the instrument dated March 2, 1959, shall remain the same as in the original agreement, subject, however, to prepayment privilege, permitting the Purchaser to make payment in part or in full, in advance of the expiration of each *35 twelve month period for the section that the purchaser is scheduled to purchase, as outlined in Paragraph 9, Page 6, of the instrument dated March 2, 1959. Also on March 2, 1960, Winding conveyed by deed to Bock-Builders the area described as section 4 in the prior contract as revised and in accordance with a new map dated November 1959 prepared by Ernst, which map was filed with the County Clerk on April 14, 1960. Bock-Builders certified thereon that it was the record holder of title to the lands delineated thereon and that it approved the filing thereof. The property covered by this deed included lots 1 and 2 of Block 9, which lots had previously been conveyed by deed of December 2, 1959. Winding conveyed to Bock-Builders on November 28, 1960, a traingular tract adjacent to lot 5 of Block 16A as shown on the map later filed dated April 1961. The maps dated November 1959 and April 1961 showed different arrangements of some streets from those in earlier maps. On May 23, 1961, Winding conveyed to Bock-Builders the tract described as Section 4A in the contract of March 2, 1959. A map of this tract dated April 1961 prepared by Ernst was filed with the County Clerk's office on June 20, 1961, and *36 identifies the tract as Section 5 of Oak Ridge. Bock-Builders certified thereon that it was the record holder of title to the lands delineated thereon and that it approved the filing thereof. On June 15, 1961, Winding granted to Bock-Builders an easement for drainage of the lands in such Section 5 to the Toms River across lands of Winding. Under date of June 26, 1961, Winding conveyed to Bock-Builders a small tract adjoining the tract transferred on March 2, 1960, and described as Section 4 in the contract of March 2, 1959. Some of the transfers of land were paid for by notes given by Bock-Builders and endorsed by Louis C. Bock and his wife. At the beginning of July 1961 there were notes outstanding on which a balance of $8,500 was due Winding and a series of notes aggregating $62,100 had been received on the 1961 sale. On July 7, 1961, these notes were returned to Bock-Builders in exchange for a check for $600 and a new note for $70,000, payable in one month to Winding. On that date or shortly thereafter Maimone endorsed the note individually and it was discounted by The First National Bank of Toms River. Winding's income tax return for 1961 reported a tax liability of $6,183.23. *37 In 1963 a deficiency of $5,539.63 was determined and paid. On the return the gain on the 1961 sale of the Oak Ridge land was reported on the installment basis and the gain was treated as ordinary income, together with the gains on prior year installment sales. Winding did not hold the Oak Ridge property primarily for sale to customers in the ordinary course of its trade or business. Opinion The petitioner sold land in 1961 for cash and a note and elected to return the gain upon the installment basis permitted under section 453 of the Internal Revenue Code of 1954, and as ordinary income. Petitioner discounted the note in 1961. The respondent determined that the "disposition of installment obligations in the year 1961 results in ordinary income of $51,513.54, since the obligations arose in connection with the sale of land in 1961 which was held primarily for sale to customers in the ordinary course of trade or business." Petitioner contests the disallowance of the installment method and alleges that it erroneously reported the sale as ordinary income and any gains resulting from this sale should be treated as capital gain. Respondent's disallowance of *38 the installment method was based upon section 453(d)[1] relating to the disposition of installment obligations. The petitioner maintains that it did not sell or otherwise dispose of the installment note in 1961 but merely made a loan thereon from the bank and pledged the installment note as security. In Alworth-Washburn Co. v. Helvering, 67 F. 2d 694 *39 (C.A.D.C., 1933), affirming 25 B.T.A. 140 (1932), a corporation reported on the installment basis the proceeds of a sale made in 1926. In 1927 it endorsed and discounted or sold to a bank for cash the notes for the remainder of the price which were due in that and later years. The taxpayer contended that it was a borrower, that the cash received was a loan, and that because of its endorsement of the notes it incurred a continuing liability to the bank which deferred its realization of gain until the liability was extinguished by the payment. The court pointed out that the bank held the notes as its own property, though it also held the taxpayer as an endorser; that the taxpayer had received its money and, except for its contingent liability as an endorser, the transaction was closed and the installment feature abandoned. In holding that the proceeds of the notes were taxable in 1927 the court stated (p. 696): To say that under these circumstances petitioner is entitled to the benefits of the installment provision would be to extend that provision beyond its plain intendment. * * * what was done here was the receipt and distribution by petitioner in 1927 of its remaining *40 profits from the transaction in question. The act specifically makes such profits taxable in the year in which received and the contingent liability which petitioner assumed as indorser does not extend the time or make the provision referred to less effective. See, also, to the same effect, Elmer v. Commissioner, 65 F. 2d 568 (C.A. 2, 1933), affirming 22 B.T.A. 224 (1931), and East Coast Equipment Co. v. Commissioner, 222 F. 2d 676 (C.A. 3, 1955), affirming 21 T.C. 112 (1953). The petitioner, Winding, "disposed" of the note, within the meaning of section 453(d), and is required to return as income in 1961 the gain or loss resulting from such disposition. We note, also, that the obligation which Winding discounted on or about July 7, 1961, was a note payable at the end of 30 days. The record does not show whether the marker paid the bank when the note became due, nor whether the bank called upon Winding to make good upon its endorsement. In the absence of any contrary showing, we may assume that the note was paid and that Winding was relieved of its contingent liability by the end of the taxable year 1961. Petitioner has not *41 shown that there was any installment due in any following year. Hence, there is no basis for deferring beyond 1961 payment of the tax by use of the installment method. In its petition Winding raises the issue whether the sale of real property in 1961 was a sale of a capital asset. Respondent contends that the property was held by Winding primarily for sale to customers in the ordinary course of its trade or business. The parties agree that each case in this field must be determined uponits own particular facts as a question of ultimate fact. Under section 1221(1) of the Internal Revenue Code of 1954 the term "capital asset" means property held by the taxpayer but does not include property held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. In Malat v. Riddell, 383 U.S. 569 (1966), the Court explained (p. 572): The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. * * *42 * We hold that, as used in sec. 1221(1), "primarily" means "of first importance" or "principally." The question is whether Winding was holding the property primarily for sale to customers in the ordinary course of its trade or business. Respondent says that Winding acquired the Oak Ridge property for the purpose of selling the unsold lots shown on a 1951 map remaining after the transfer to it. Winding had a new map dated October 1956 prepared for sales purposes. This showed 423 building lots in Oak Ridge. It sold Bock 31 lots at $700 per lot with an option to purchase some 20 blocks more and continued to sell other parcels to Bock in July and October 1958 and January 1959. The contract of March 2, 1959, was for four sections successively in the next four years at $4,650 per acre. This contract was revised the next year. Respondent says that subsequently Bock defaulted and Winding sold the remainder of the Oak Ridge property in 1965. This extensive activity on the part of Winding, says the respondent, shows that it was in the business of selling lots. It is the petitioner's position that it held the entire tract of 710 acres acquired from Maimone as an investment; that it offered *43 the entire tract as a unit; that it made one sale to Bock, or Bock-Builders, of amount 115 acres under which the purchaser would acquire and pay for several acres, develop that part by building houses, and then take another portion when it could pay for the next tract - in other words, a sale of acreage; that Winding did not build upon or improve the land and did nothing to promote sales of houses; and that Winding has continued to hold to the present time the remaining 600 acres as an investment offered for sale as a unit. Winding was originally organized in 1949 to operate a riding ranch and restaurant in which Maimone and his wife provided the land and buildings and the Hoffmanns operated the business, with the earnings to be shared according to the stockholdings. This operation proved unprofitable and Maimone bought out the other stockholders. In 1956 Maimone and his wife transferred 710 acres to Winding. Maimone had advertised this property or a part of it for sale and Winding advertised it later. Whether the advertising related to the Oak Ridge part of the property, as distinguished from the remainder, is not shown. The Oak Ridge portion had as early as 1951 been laid out *44 as a subdivision in blocks and lots on a map filed in the County Clerk's Office. Whether any part of this had been built upon is not shown. Maimone had sold some blocks earlier, but Winding had sold none of it. Bock, who was a home builder, sought to purchase this tract or part of it for building. Maimone was willing to have Winding sell the entire tract, but Bock could not provide the funds to pay for all of it. Accordingly, it was agreed to transfer to Bock, or his corporation, portions of the entire property as the builder could build upon them, sell the houses and pay for the next portion. The essence of the contract, as it appears from the evidence, was a single agreement for sale rather than a series of sales. The nature of this transaction made necessary a number of subsequent contracts and many deeds, but they were all pursuant to the original agreement. Winding did not improve the property, did not build, and did not sell to homeowners or advertise the homes. It acquired no other property. The activities of Bock and his corporation, in securing new maps and filing them, and of obtaining approval of the local Planning Board, are not activities imputable to Winding. It is shown *45 that Bock sometimes rearranged the streets and changed the sizes of the lots in the later maps from those shown in the earlier maps. This may have been agreed to by Winding, but was not activity on its part. Winding held the Oak Ridge property as an investment. While the property was considered for sale, and an agreement for sale to Bock was made, Winding did not hold the property primarily for sale to customers in the ordinary course of its trade or business. Decision will be entered under Rule 50. Footnotes
1. SEC. 453. INSTALLMENT METHOD. * * *
(d) Gain or Loss on Disposition of Installment Obligations. - (1) General Rule. - If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and - (A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or (B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.↩